585 So.2d 405 (1991)
Phillip Lee O'SHEA, Appellant,
v.
Michelle R. O'SHEA, Appellee.
No. 91-355.
District Court of Appeal of Florida, First District.
August 27, 1991.
Michael T. Webster of Michael T. Webster, P.A., Shalimar, for appellant.
C. LeDon Anchors of Anchors, Foster & McInnis, P.A., Fort Walton Beach, for appellee.
SHIVERS, Judge.
The father, Phillip Lee O'Shea, appeals the trial court's order denying his petition for modification of child custody. We reverse and remand for a new trial.
Appellant, Phillip Lee O'Shea, and appellee, Michelle R. O'Shea, were married on May 4, 1985, had one child, Christopher Lee O'Shea, born July 8, 1987, and separated when the child was six months old. A final judgment of dissolution was entered in May 1989, approving a marital settlement *406 agreement giving primary residential custody of Christopher to the mother with visitation rights to the father. The next year, in May 1990, the father sought modification of the final judgment, requesting primary residential custody and alleging among other things that the mother had an on and off live-in relationship with Dr. Michael Archer since the entry of the final judgment and that the relationship was having a detrimental effect on the child Christopher.
A Guardian Ad Litem was appointed to represent the minor child to conduct a home study and furnish the trial court with its written report.
A hearing was held on December 6, 1990. At the conclusion of the hearing the trial court, by a terse order, denied the petition for modification on the basis that the father had failed to establish a material change in circumstances since entry of the final judgment, or that a change in custody would be in the best interest of the child. The court made no comments on the Guardian Ad Litem's Report and no particular comments on any of the evidence. The father appeals this denial.
In the instant case, the father presented ten witnesses at the December 6, 1990 hearing and the mother presented six. In sum, the evidence was undisputed that, at the time of the parties' divorce, the mother and child were living in the marital home, the mother worked 9:00 to 5:00 at a Barnett Bank, and the child was enrolled full-time in day care. Sometime after the dissolution, the mother and child moved out of the marital home and into another house, which they shared with Sharmaine Skipper. In September 1989, the mother and child moved into a two-bedroom apartment, which they shared with Denise Godwin and another woman and, for a one-month period in 1990, with a male friend of Godwin. In October 1989, the mother began a relationship with Archer. Beginning in early 1990, she and the child began staying overnight at Archer's house. In July 1990, the mother "moved back in" to her apartment for approximately ten days after she and Archer had an argument. In August 1990, she and the child "moved in" with Archer again and, in October 1990, moved back into the apartment. Sometime during this period of time, the mother quit her job at Barnett Bank to begin working as a waitress at Red Lobster two to three nights per week from approximately 4:00 to 10:00 p.m., and the child began attending day care two days per week. On the nights the mother worked, Denise Godwin watched the child at the apartment.
The father presented testimony of the child's day care attendant that, between November 1989 and May 1990, the child appeared at the center after staying with the mother and Archer with bruised ears. When questioned, the child "would flick himself in the head and he said that Michael (Archer) did that to him when he would be a bad boy." The day care attendant also testified that the child was definitely happier when he had been staying with the father and the father's new wife than when he stayed with the mother and Archer, and that the child had undergone a "real change in behavior" after he started attending day care only two days per week instead of five. The father's mother also testified that the child's relationship with the mother had changed since the divorce, and that he would "freeze up" and appear frightened when the mother came to pick him up from the grandmother's home. The father's sister testified that the child told her spontaneously that Archer was a "mean man and he did not want to go to Michael's house and he begged me not to take him to Michael's house," and that the child had begun to appear frightened when he would spend the night at the father's sister's house. The father also presented evidence (by way of two of Archer's exwives) that Archer had been physically abusive to them.
Last, the child's court-appointed Guardian Ad Litem presented a thorough report of her observations of the child and both parents, and "very strongly" recommended that custody be modified to the father. The guardian ad litem stated "I have never in all my years of being around children seen such a change in personality in a child from being at Mr. O'Shea's house and at *407 the nursery school where I talked to him and being with Mrs. O'Shea. He was two little boys, two absolutely changed little boys." She stated that the child was "friendly, loving, happy, cheerful" when staying at the father's house, but that he became "demanding, cranky, did absolutely everything opposite of what his mother asked him to do" when with the mother. She also stated that the child was confused as to where he lived, that "a lot of people" had told her about the child's bruised ears, and that the boy himself "informed me that Michael, when he got mad at him, thumped him on the head," and told her in October of 1990 that "he did not want to go back to Michael's." The guardian ad litem's report recommended that it would be in the best interests of the child to be with the father.
The mother, on the other hand, testified that she was aware of all of the negative things that had been said about Archer, but stated that Archer treated the child "as a son," and that, to her knowledge, Archer had never spanked the child. She admitted, however, that Archer did watch the child on occasion while she worked at night. She also admitted that the child and his father had a very close relationship and that her former husband was a good father. The mother presented three friends who testified generally that the mother and child had a normal relationship. Archer himself also testified that he loved the child and had never done anything to physically harm him. In addition, the mother presented the testimony of psychiatrist Stephen Doheny, who was hired by mother to evaluate her relationship with the child. After consulting with the mother on one occasion, and with the mother and child on another, Doheny concluded that the mother was a "competent and devoted mother," that the child showed no signs of abuse or neglect, and that it would "not be in the best interest of Christopher to be removed from Michelle O'Shea as his primary custodial parent." Doheny admitted, however, that he had never met the father, and that he did not perform any psychometric testing or evaluation of the mother or child. No negative testimony was given by either party or their witnesses regarding the father's relationship with the child or his abilities as a father.
Ann Ripley, a former wife of Archer, testified about Archer's violent behavior and physical abuse of her. She stated that she, and her, now five-year-old, son Drew had lived with Archer for more than two years, the last year of which (October 1988 through September 1989) was during their marriage. When asked whether or not Archer could provide a proper environment for raising a child, the mother's lawyer objected to the relevancy of the question and the trial court sustained the objection. When Ann Ripley was asked about Archer's relationship with his own nine-year-old son, the mother's lawyer objected and the objection was sustained. It also appears that, based specifically on those rulings, only a limited portion of the deposition of a former wife, Linda Crewe, was offered into evidence. The appellee mother contends that because the excluded testimony was not proffered, that we cannot determine the propriety of excluding the evidence.
It is true, as a general rule, that if a proffer is not made, an appellate court cannot determine the propriety of excluding the evidence. However, section 90.104(1)(b), Florida Statutes, provides:
(1) A court may predicate error, set aside or reverse a judgment, or grant a new trial on the basis of admitted or excluded evidence when a substantial right of the party is adversely affected and:
(b) When the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer of proof or was apparent from the context within which the questions were asked. (e.s.)
In Seeba v. Bowen, 86 So.2d 432 (Fla. 1956), Justice O'Connell wrote that a proffer is unnecessary "where the offer would be a useless ceremony, or the evidence is rejected as a class, or where the court indicates such an offer would be unavailing... ." citing 88 C.J.S. Trial § 74, p. 180. See Trawick Fla. Prac. and Proc., 1990 Ed., § 22.10, page 312.
*408 It is clear the substance of the evidence sought was apparent from the context within which the questions were asked. It is also clear the trial court would limit the testimony of the former wives as a class. Proffer was unnecessary. Because of Archer's pervasive presence in the lives of the child and his mother, the questions asked about whether Archer could provide a proper environment for the child and about his relationship with his own child were very relevant and the trial court reversibly erred in sustaining objections to such questions. The father should have been able to fully explore for the record this germane inquiry. There was strong evidence that the best interest of the child would be to go to the father. There was also evidence that change of custody was not necessary. A critical factor is the nature of the environment that the child would be subjected to in Archer's home. The trial court's error in limiting the testimony in that area necessitates a new trial.
REVERSED and REMANDED.
ZEHMER and KAHN, JJ., concur.